UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Joseph Anthony Favors, | No.  13-cv-428 (JRT/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION ON THE STATE DEFENDANTS' MOTION TO DISMISS; DEFENDANT BENSON'S MOTION TO DISMISS, COUNTY OF DAKOTA'S MOTION TO DISMISS; AND DEFENDANT HOOVER'S MOTION TO DISMISS** |
| Michelle Hoover, et al, | |
| Defendants. | |

Joseph Anthony Favors, *pro se*.

Anthony R. Noss and Ricardo Figeroa, Assistant Attorneys General, Office of the Attorney General, State of Minnesota, for the State Defendants and Defendant Benson; Andrea G. White, Assistant County Attorney, for Defendant County of Dakota; Angela Helseth Kiese, Assistant Attorney General, Office of the Attorney General, State of Minnesota, for Defendant Michelle Hoover.

_____

Leo I. Brisbois, United States Magistrate Judge.


    This matter is before the undersigned United States Magistrate Judge on the

State Defendants' Motion to Dismiss Plaintiff's Complaint, [Docket No. 88];[1] Defendant

_____

[1] "State Defendants" used herein refers to the following defendants named in the complaint, with the corrected spelling in brackets:  Eyvette Anderson [Yvette Anderson]; Craig Berg; Tracy Gebhart; (O.D.) Gullickson [Bill Gullickson]; Jon Hibber [John Hibbard]; Deb James; Jena Jones [Jenna Jones]; Terry Kneisel; Jamie Kozisch [Jaime Wuori]; Ann Linkert (Zimmerman) [Ann Zimmerman]; Thomas Lundquist [Tom Lundquist]; Dianna Magaard; Chad Mesojedec; Rick O'Conner; Rebecca Ranem [Jessica Ranem]; Juli Rose [Julie Rose]; Rob Rose; Kevin Schlerer [Kevin Schleret]; Ralph Schmidt; Attorney General Lori Swanson; Mandy Torgerson; Beth Virden; Todd White; Steven Youngst [Steve Youngs]; Jeanine Herbert [Jannine Hebert]; Jean Seykora; Dan Storkamp; Lucinda Jesson; Office of Licensing for the Security Hospital; Individual/Official Capacities, DHS/MSOP; DHS Office of Maltreatment Complaints, Individual/Official Capacities, and State of Minnesota.  (*See* State Defs.' Mem. of Law in Supp.

Dennis Benson's Motion to Dismiss Plaintiff's Complaint, [Docket No. 132]; County of Dakota's Motion to Dismiss, [Docket No. 139]; and Defendant Michelle Hoover's Motion to Dismiss, [Docket No. 195] (collectively, the "Motions to Dismiss").[2]  The case has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed below, the Court recommends that the Motions to Dismiss be **GRANTED**.[3]

## I.    BACKGROUND

Joseph Anthony Favors ("Favors") is civilly committed as a "sexually dangerous person" and "sexual psychopathic personality" at the Minnesota Sex Offender Program in Moose Lake, Minnesota ("MSOP").  (Compl. ¶ 21).  Favors brought a complaint against Defendant Michelle Hoover ("Hoover") and others arising out of his parole revocation and imprisonment for stalking Hoover at MSOP.  Favors alleges he was

---

of their Mot. to Dismiss [Docket No. 90], at 1 n.1 (indicating correct spelling of defendants' names in brackets)).

Although Michelle Hoover and Dennis Benson were State employees, and although both are represented by the State of Minnesota, they have made their own motions to dismiss and are not "State Defendants," as that term is used in this Report and Recommendation.  Additionally, the Minnesota Office of Health Facility Complaints and employees of the Minnesota Department of Corrections have made a separate Answer, [Docket No. 87], and are not "State Defendants," as that term is used in this Report and Recommendation.  (See fn. 3, infra).

[2] The Motions to Dismiss seek dismissal of Favors' federal claims; they do not address Favors' state claims, except to ask that the Court decline to exercise supplemental jurisdiction over those state claims.

[3] Fifteen defendants have already been dismissed from this case after Favors failed to timely serve them with the summons and complaint in accordance with Federal Rule of Civil Procedure 4(m): Cal Ludeman, Linda Berglin, David Prescott, Jamie Jungers, Deb Konieska, Marnie Dollinger, Tim Gorr, Natalie Steinert, Leslie Barfknetch, Kevin Browne, Eric Melby, Rod Liggett, John Hoffman, Jenny Chestbrough, and Phil Wilder.  (Mem. Op. & Order [Docket No. 167).

Additionally, the following defendants have not moved to dismiss, but rather, they answered: Joan Fabian, Jeffrey Peterson, John King, and Deborah Schadegg, all of the Minnesota Department of Corrections (collectively, the "DOC Defendants"); and the Minnesota Office of Health Facility Complaints (the "OHFC").  (Answer [Docket No. 87]).

subject to punitive confinement, counter-therapeutic environment, inadequate treatment, retaliation, interference with making complaints, discharge from treatment, isolation, imprisonment, false criminal charge, cruel and unusual abuses, and loss of personal property. (Compl. ¶¶ 100-02, 196-270, 330, 434-36).

Favors alleges that Hoover, a security counselor at MSOP, made ten retaliatory and false reports against him, the first occurring on December 8, 2009. (Compl. ¶¶ 42, 103-28, 130-33, 150-55, 165-83, and 187-95). Favors filed complaints against Hoover to the Office of Special Investigations for MSOP, alleging that Hoover made false, retaliatory reports against him because he had reported her inappropriate relationship with a patient. (Compl. ¶¶ 44-45, 112, 115, 118, 122, 129). On January 8, 2010, Favors filed a complaint against Hoover, attaching supporting affidavits from other MSOP patients, reporting they saw evidence that Hoover was having a sexual relationship with Michael Crow ("Crow"). (Compl. ¶ 129). One of the patients was given, and passed, a polygraph test. (*Id.*)

Hoover and Favors continued to file complaints against each other. (Compl. ¶¶ 144-64). On March 12 and 13, 2010, Hoover wrote a report accusing Favors of stalking her. (Compl. ¶¶ 165-77). Favors wrote a complaint about Hoover, alleging her report was false and urging Defendants Jungers, Magaard and Virden to review security camera footage that would exonerate him. (Compl. ¶¶ 176, 178-83). Favors alleged all defendants who were aware of his complaints against Hoover failed to investigate. (Compl. ¶ 175-76.)

In May 2010, Hoover allegedly wrote her tenth false and retaliatory report against Favors, requesting that he be placed on an Individual Program Plan (an "I.P.P."),

restricting him from recreation and education activities from noon until 9:00 p.m., while Hoover was in those areas.  (Compl. ¶¶ 187-98).  Favors filed a complaint about this to the Hospital Review Board (the "HRB") on January 23, 2012.  (Compl. ¶ 201).  Dennis Benson ("Benson"), the Executive Director of MSOP, responded to the HRB.  (Compl. ¶ 205).  Benson's letter stated that Favors' allegations of staff misconduct were received and investigated, and Favors was directed to stop reporting false allegations and harassing staff, and stating that Favors could be subject to "Behavioral Expectations Violations" if he continued.  (Compl. ¶ 206).

Then, on June 10, 2010, Favors alleges that Defendant Konieska[4] wrote a false Quarterly Review Report ("QRR")[5] accusing Favors of targeting several female staff members and continuing to do so after numerous directives to stop, of making false allegations against Hoover, and of complaining when female staff members did not agree with his grievances.  (Compl. ¶ 216).  The report said Favors' motive was to watch Hoover whenever she was near Crow and to document their interactions.  (*Id.*)  In doing so, he violated three rules that quarter.  (*Id.*)  Favors complained about this QRR to the HRB.  (Compl. ¶¶ 217, 238).  The same allegations against him in the QRR were used against him in his parole revocation hearing.  (Compl. ¶ 220).  On the same day the QRR was issued, Favors was placed in isolation and his legal materials were confiscated.  (Compl. ¶¶ 229-42).  He was also discharged from sex offender treatment.  (Compl. ¶ 241).

---

[4] Konieska was never served with the Complaint, and was dismissed from this action on December 12, 2013, (Mem. Op. & Order [Docket No. 167]); she is not a party to any of the motions to dismiss addressed herein.

[5] The Report is called "Quarterly Treatment Review."  (Ex. 40 [Docket No. 106-3], at 40).

Favors was then charged with stalking Hoover in violation of his release conditions.  (Compl. ¶ 253).  The Hearings and Release Unit of the Department of Corrections (the "DOC") held a release ("parole") revocation hearing on August 23, 2010.  (*Id.*)  According to Favors, Hoover gave false testimony about his conduct and about her sexual relationship with Crow.  (Compl. ¶¶ 253-66).  Magaard allegedly testified falsely that she told Favors on four occasions not to file any more complaints against Hoover.  (Compl. ¶ 210).  Upon his parole revocation, Favors remained in prison for seven months, until his sentence expired on February 11, 2011.  (Compl. ¶ 263).  In the meantime, Hoover and other defendants instigated a criminal complaint against Favors for stalking.[6]  (Compl. ¶¶ 267-68).  As a result, Favors was taken in chains and shackles to Carlton County District Court.  (Comp. ¶ 270).  On December 3, 2010, the complaint was dismissed "in the interests of justice."  (Ex. 58 [Docket No. 106-3], at 116).

In October 2010, MSOP patient Crow was facing his own parole revocation.  (Compl. ¶ 276).  Favors contends that Crow made a deal with Jungers to inform about Crow's relationship with Hoover in exchange for not revoking his parole.  (*Id.*)  On October 15, 2010, Hoover was fired "for doing everything alleged in Mr. Favors' complaints."  (Compl. ¶ 274).  Hoover was criminally charged, on May 9, 2011, for bringing marijuana into MSOP and having a sexual relationship with a patient between mid-2009 and January 2010.  (Compl. ¶¶ 282-84).  Favors asserts that this proves that he was wrongfully imprisoned for stalking.  (Compl. ¶¶ 286-87).  He alleges that defendants either made no effort or refused to seek his release from prison after Hoover

---

[6] Favors alleges that this occurred in September 2010.  (Compl. ¶¶ 267-68).  The complaint was actually dated August 4, 2010.  (Ex. 59 [Docket No. 160-3], at 117-19).

was "caught and terminated" in October 2010.   (Compl. ¶ 288). He alleges that he remained wrongfully imprisoned until February 11, 2011.  (*Id.*)

Favors alleges that Hoover and others violated his First, Fourth and Fourteenth Amendment rights under the United States Constitution, and the Minnesota Constitution.   (Compl. ¶¶ 387-91).  He further alleges violations of state statutes, rules and MSOP policies.   (Compl. ¶¶ 378-86, 392-431).   Favors seeks monetary and injunctive relief, costs and attorney's fees.  (Compl. ¶¶ 432-87).

## II.   MOTIONS TO DISMISS

### A.   Hoover

Hoover filed a motion to dismiss, [Docket No. 195], arguing (1) that Favors' constitutional allegations fail to state an actionable claim against her because they are either factually deficient or not cognizable as a matter of law; (2) that Favors' conspiracy claim fails as a matter of law; (3) that Favors' claims under the Minnesota Commitment Act fail as a matter of law; (4) that the court should dismiss the remaining state law claims; (5) that the Minnesota Constitution does not provide a private cause of action; (6) that the *Heck* Doctrine[7] bars Favors' § 1983 claims; and (7) that Hoover is entitled to qualified immunity and common law official immunity.  (Def. Michelle Hoover's Mem. in Supp. of Mot. to Dismiss) [Docket No. 196] (hereinafter "Hoover's Mem."); Ex. 2, Dec. 8, 2009, MSOP Incident Report [Docket No. 197]; Aff. Kiese [Docket No. 198]).

Favors opposes Hoover's motion to dismiss, asserting (1) that the *Heck* Doctrine does not bar his claims because a habeas court (Washington County District Court) impugned and invalidated his conviction (supervised release revocation); (2) that there

---

[7] *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

are disputed facts; (3) that Hoover does not have absolute witness immunity for giving false testimony; (4) that he has stated a Fourteenth Amendment deprivation of life, liberty and property; (5) that he has alleged material facts to demonstrate conspiracy to retaliate; and (6) that Hoover is not entitled to qualified immunity or common law immunity because her actions were retaliatory in violation of state, federal and constitutional laws.  (Pl's Opp. to Def. Hoover's Mot. to Dismiss the Compl.) [Docket No. 203].

### B.   The State Defendants

The State Defendants filed a motion to dismiss.  [Docket No. 88].  They contend (1) that they are entitled to Eleventh Amendment Immunity from monetary damages in their official capacities; (2) that Favors failed to allege personal involvement by many of the State Defendants in any unconstitutional act; (3) that Favors failed to state a claim upon which relief can be granted; and (4) that they are entitled to qualified immunity and common law official immunity.  (State Defs.' Mem. of Law in Supp. of their Mot. to Dismiss [Docket No. 90] (hereinafter, "State Defs.' Mem.")).

Favors opposed the State Defendants' motion to dismiss.  (Pl's Reply to State Defs.' Mem. Supporting their Mot. to Dismiss the Compl. [Docket No. 165] (hereinafter, "Pl's Reply to State Defs.' Mem.")).  Favors claims he did not raise a retaliation claim against all State Defendants.  (*Id.* at ¶ 4).  He disputes facts cited by the State Defendants in support of their claim that evidence provides proper, nonretaliatory motives for the restrictions imposed on him, and for his parole revocation.  (*Id.* at ¶¶ 5-16).  Favors contends the State Defendants are not entitled to official immunity because their actions were "willful wrongs," and because their actions involved ministerial duties.

(*Id.* at ¶¶ 59-63). He contends they are not entitled to qualified immunity. (*Id.* at ¶¶ 64-67).

The State Defendants replied that Favors' retaliation claims fail because he does not allege facts supporting a causal connection between any alleged retaliatory act by any State Defendant and Favors' prior protected communications. (*See* State Defs..' Reply Mem. of Law in Supp. of their Mot. to Dismiss Pl's Compl. [Docket No. 137]).[8] The State Defendants claim that they are entitled to qualified immunity and common law official immunity. (*Id.* at 9). Finally, they argue that the court should decline to exercise supplemental jurisdiction over Favors' state law claims. (*Id.* at 8-9).

### C.    Benson

Dennis Benson filed a separate motion to dismiss, [Docket No. 132], incorporating the State Defendants' arguments by reference, and arguing that Favors' First Amendment retaliation claim fails to state a claim against him. (Def. Dennis Benson's Mem. of Law in Supp. of his Mot. to Dismiss Pl's Compl. [Docket No. 131] (hereinafter "Benson's Mem.")). Favors opposed the motion. (Pl's Reply to State Def. Dennis Benson's Mot. to Dismiss [Docket No. 164]).

### D.    Boreland and Mehl

The County of Dakota ("the County"), on behalf of Defendants Christopher Boreland ("Boreland") and Mark Mehl ("Mehl"), also filed a motion to dismiss, [Docket No. 139], arguing (1) that Favors failed to allege their personal involvement in any

---

[8] The court struck Favors' first opposition brief, [Docket No. 108], because it violated the District of Minnesota Local Rules. (*See* Order [Docket No. 119], at 9). Nevertheless, the State Defendants replied to Favors' first opposition brief, [Docket No. 137], and did not reply to his second opposition brief, which was accepted for filing by the Court. The Court will consider the State Defendants' Reply to the extent that it responds to issues raised in Favors' second opposition brief.

constitutional violation; (2) that to the extent the 42 U.S.C. § 1983 claims are brought in their official capacities, Favors failed to state a claim because there is no respondeat superior liability, and the complaint fails to establish an unconstitutional custom or policy of the County; (3) that Boreland and Mehl are entitled to absolute immunity from federal claims; and (4) that Boreland and Mehl are entitled to common law official immunity and qualified immunity from Favors' state law claims.  (Def. County of Dakota's Mem. in Supp. of Mot. to Dismiss [Docket No. 141] (hereinafter, "County of Dakota's Mem.")).

Favors opposed the motion to dismiss, (Pl's Reply to County Defs. Boreland and Mehl's Motion to Dismiss [Docket No. 170]), arguing that he stated constitutional claims in the complaint.  (*Id.* ¶ 6).  Essentially, Favors alleges that Boreland and Mehl participated in his revocation hearing, although they knew that the evidence against him was fabricated and that Hoover's real motive was retaliation because he reported her misconduct.  (*Id.* ¶ 16).

Favors states that he did not make any allegations against Boreland and Mehl for their testimony at the revocation hearing; therefore, absolute immunity does not apply.  (*Id.* ¶ 48).  He also alleges that Boreland and Mehl refused to look at exculpatory evidence, which was withheld by Defendants Jungers and Magaard.  (*Id.* ¶¶ 49-50).  Because they refused to look at exculpatory affidavits from Favors' witnesses, Favors argues they are not entitled to official or qualified immunity because they committed a willful wrong.  (*Id.* ¶¶ 51-56.)  He further asserts that it was unconstitutional to permit Hoover to testify against him when Boreland and Mehl knew he had previously filed complaints against Hoover related to the stalking allegation.  (*Id.* ¶ 54).

The County replied, asserting Favors cannot cure deficiencies in the complaint by adding new allegations in his response.  (Defs.' Boreland and Mehl Reply Mem. in Supp. or Mot. to Dismiss [Docket No. 187], at 2).  The County contends that Favors made conclusory allegations against Boreland and Mehl, and that he did not allege any specific facts describing their personal involvement; thus, failing to state a claim under 42 U.S.C. § 1983.  (*Id.* at 1-2).  The County also asserts that Favors did not allege facts showing a meeting of minds to form a conspiracy, and therefore, that his claim under 42 U.S.C. § 1985 also fails.  (*Id.* at 3).  Finally, the County asserts immunity for Boreland and Mehl in their respective roles as probation officer and supervisor of the Adult Intake Unit of the Dakota County Community Corrections Department.  (*Id.* at 4).

### E.    Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint, on its face, must allege sufficient facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility is not a "probability requirement."  *Id.*  It means success on the merits is more than a "sheer possibility."  *Id.*  A complaint contains a plausible claim if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

In making this determination, courts must assume all facts in the complaint are true and construe all reasonable inferences from those facts in the light most favorable to the plaintiff.  *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).  The

assumption does not apply, however, to legal conclusions or "formulaic recitation of the elements of a cause of action." *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Factual allegations may be so devoid of "factual enhancement" that, without more, they do not state a claim. *Id.* (quoting *Twombly*, 550 U.S. at 557). The complaint should be read as a whole, not piece by piece, to determine whether the claims are plausible. *Braden v. Wal-Mart Stores, Inc.* 588 F.3d 585, 594 (8th Cir. 2009). Furthermore, *pro se* complaints are held to less stringent standards than those drafted by lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Yet, a *pro se* complaint must allege facts rather than bare, unsupported legal conclusions. *Martin v. Sargent*, 780 F.3d 1334, 1337 (8th Cir. 1985). "[M]aterials attached to the complaint as exhibits may be considered in construing the sufficiency of the complaint." *Reynolds*, 636 F.3d at 979 (quoting *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)).

## III.   ANALYSIS

### A.   Eleventh Amendment Immunity

"[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). State agencies may invoke Eleventh Amendment immunity if it protects the state treasury from liability. *Hadley v. North Arkansas Community Technical College*, 76 F.3d 1437, 1438 (8th Cir. 1996). The Eleventh Amendment bar also includes officials sued for damages in their official capacity because "a judgment against a public servant 'in his official capacity' imposes liability on

the entity that he represents . . . ."  *Graham*, 473 U.S. at 169 (quoting *Brandon v. Holt*, 469 U.S. 464, 471 (1985)).

The State Defendants include the State of Minnesota, the Department of Human Services (the "DHS"), the MSOP's Office of Health Facility Complaints, the MSOP's Office for Maltreatment Complaints, the Office of Licensing for the Minnesota Security Hospital, and various state employees in their official and individual capacities.  (State Defs.' Mem. at 1, n. 1).  Benson, Boreland and Mehl are also state employees sued in their official and individual capacities.  (Compl. ¶¶ 27, 57, 58).

Favors alleges that he is suing defendants in their official capacities only for injunctive relief.  (Compl. ¶ 17).  Nonetheless, insofar as the complaint might be construed to contain a claim for damages against the State of Minnesota,[9] DHS, the Office of Health Facility Complaints, the Office for Maltreatment Complaints, and the Office of Licensing for the Minnesota Security Hospital (Compl. ¶ 75, 77-79), those claims are barred by the Eleventh Amendment and should be dismissed.

### B.  *Heck* Doctrine

In *Heck v. Humphrey*, the Supreme Court held,

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

512 U.S. 477, 486-87 (1994).

---

[9] This would include the claims for damages against State of Minnesota employees Benson, Boreland, and Mehl in their official capacities.

1.      **Favors' Habeas Petitions**

Favors petitioned for federal habeas relief from his civil commitment at MSOP, based on many of the same allegations alleged in the present action.  *Favors v. Jesson*, No. 13-cv-108 (JRT/LIB), 2013 WL 4052668, at *1-2 (D. Minn. Aug. 9, 2013).  The Hon. John R. Tunheim found that Favors had not exhausted his state law remedies and dismissed the habeas petition without prejudice.  *Id.* at 5.

Four days before his release from the Minnesota Correctional Facility in Stillwater ("MCF-Stillwater"), Favors filed a petition for a writ of habeas corpus in Washington County District Court.  *Id.* at *1.   Favors sought release from MCF-Stillwater and discharge from his civil commitment at MSOP, Moose Lake.  *Id.*  Respondents to the state habeas petition erroneously filed their response with the wrong court, Carlton County District Court.  *Id.*  Further complicating matters, the Carlton County Court issued an order dismissing Favors' constitutional challenge to his commitment on the merits.  *Id.*  The Washington County Court, where the petition had been filed, also issued an order.  *Id.*  Washington County District Court Judge Elizabeth H. Martin made the following statements in her order:

> Because Petitioner is no longer confined at the Stillwater prison, the Court is unable to grant Petitioner's immediate release from custody on any alleged illegality, even if this Court were to find such a remedy appropriate.  Petitioner has served his time and is no longer subject to DOC custody, as Petitioner's criminal sentence ended on February 11, 2011, and is therefore no longer subject to supervised or conditional release.  He may be entitled to a change in the record or credit to be applied to any future sentence or some such remedy given the total picture of what happened here.  At a minimum he is entitled to have the Respondents and any other staff person or tribunal member receive a copy of this order so that if they are capable of "lessons learned" about animus, misplaced or premature conclusions, or other bias they can take the lesson to heart.

> It appears that Petitioner may have been engaging in inappropriate behaviors, but the so-called "unfounded" claims about Respondent Hoover now have merit to warrant her arrest and current prosecution for inappropriate behaviors with clients at MSOP – Moose Lake. Hoover's reports about Petitioner's inappropriate behavior came at the same time, or [very shortly] after, Petitioner was making these accusations against Hoover. Given the sequence of events leading to revocation of Petitioner's conditional release, Petitioner may very well have a cognizable retaliation claim. The revocation is now part of petitioner's record and could adversely affect any future proceedings, which means that the revocation could have collateral consequences for Petitioner in the future.
>
> . . .
>
> Even though the Court is dismissing Petitioner's Habeas Petition with respect to his confinement in Stillwater prison, the Court also notes that Petitioner is not precluded from pursuing an action under 42 U.S.C. 1983.

(Ex. 48 [Docket No. 106-3], at 108-09).

Favors appealed the Washington County and Carlton County District Court orders to the Minnesota Court of Appeals, which vacated the Carlton County Court's order, and affirmed the Washington County Court's order, dismissing Favors' claims against the DOC because he was no longer confined at MCF-Stillwater, and transferring the remaining claims against the MSOP to Carlton County. *Favors*, 2013 WL 4052668, at *2. The Minnesota Supreme Court denied review of the Minnesota Court of Appeals' decision. *Id.* The Carlton County District Court has yet to rule on Favors' habeas petition. (Hoover's Mem. at 28 n. 14) (citing *Favors v. Boreland et al*, Carlton County Dist. Ct. File No. 09-CV-11-2276).[10]

### 2. Analysis

Favors asserts that the Washington County District Court impugned or

---

[10] Docket available at http://www.mncourts.gov/default.aspx?page=1927#Required

invalidated his conviction (supervised release revocation) by making the statements quoted above, thus allowing his 42 U.S.C. § 1983 action to move forward. (Pl's Opp. to Def. Hoover's Mot. To Dismiss [Docket No. 203], at 7-10). He also contends that because he cannot be released from imprisonment at Stillwater, a judgment by this Court in his favor on his § 1983 claims would not "demonstrate the invalidity of any outstanding criminal judgment" because there is no outstanding criminal judgment after his sentence expired. (*Id.* at 10-11 (quoting *Heck*)).

The Eighth Circuit Court of Appeals addressed *Heck's* "favorable-termination rule" in *Entzi v. Redmann*, 485 F.3d 998, 1003 (8th Cir. 2007). Entzi brought a 42 U.S.C. § 1983 claim against prison officials, challenging his loss of sentence reduction credits. *Id.* at 1000-1001. The loss of credits extended his imprisonment by a year. *Id.* at 1001. Entzi filed his § 1983 claim after he was released from prison. *Id.* The Eighth Circuit held Entzi's claims were barred by *Heck's* favorable-termination rule: "the principle barring collateral attacks—a longstanding and deeply rooted feature of both the common law and our own jurisprudence—is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated." *Entzi*, 485 F.3d at 1003 (quoting *Heck*, 512 U.S. at 490, n. 10).

The Eighth Circuit in *Entzi* did not follow the dicta in a different post-*Heck* U.S. Supreme Court case, *Spencer v. Kemna*, 523 U.S. 1, 21 (1998):

> [A] former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy.

*Entzi*, 485 F.3d at 1003. The Eighth Circuit in *Entzi* declined to follow this dicta,

"[a]bsent a decision of the Court that explicitly overrules what we understand to be the holding of *Heck* . . ." *Id.* The United States Supreme Court has not taken up the split in the circuit courts over whether this language in *Spencer* is dicta. *See Wilson v. Johnson*, 535 F.3d 262, 267 (4th Cir. 2008) ("As evidenced by the circuit split, the Supreme Court has yet to conclusively decide if a former inmate can file a § 1983 claim when his habeas avenue to federal court has been foreclosed") (citing *Muhammed v. Close*, 540 U.S. 749, 752 n.2 (2004)); *see also Newmy v. Johnson*, No. 3:13CV00132 JLH-JTR, 2013 WL 2552734, at *2 n. 5 (E.D. Ark. June 10, 2013) ("The Supreme Court has not ruled on this issue."))

If Favors was to succeed on his 42 U.S.C. § 1983 claims alleging that his parole revocation was based on false allegations that he had stalked Hoover, it would impugn the validity of his imprisonment. The Minnesota Court of Appeals affirmed Washington County Court's dismissal of the habeas claims against respondents at MCF-Stillwater because Favors was no longer incarcerated there, and affirmed the decision to transfer remaining claims against MSOP respondents to Carlton County District Court. The Washington County District Court did not rule on the merits of Favors' claims; therefore, it did not invalidate or impugn his parole revocation. *See Marlowe v. Fabian*, 676 F.3d 743, 747 (8th Cir. 2012) (court of appeals decision was not a favorable determination of habeas petition because court did not grant the relief requested). Furthermore, the Carlton County District Court has yet to decide Favors' habeas petition, which alleges that he is wrongfully confined at MSOP based on retaliation and cruel and unusual abuse.

Habeas relief is unavailable for Favors' claim that he was wrongfully imprisoned at MCF-Stillwater upon his conviction (parole revocation) because he is no longer incarcerated there, and his sentence is expired. *See Newmy*, 2013 WL 2552734, at *2. ("[Plaintiff] cannot bring a section 1983 claim and seemingly does not have an avenue of relief to pursue his allegation that a parole officer's false statements caused [his] revocation of parole and violated his due process rights.")  The Eighth Circuit decision in *Entzi* controls, and *Heck* bars Favors' 42 U.S.C. § 1983 claims against Hoover, to the extent those claims allege that Hoover's conduct caused his parole to be revoked.

The *Heck* doctrine also applies to "damages for . . . other harm caused by actions whose unlawfulness would render a conviction or sentence invalid." *Edward v. Balisok*, 520 U.S. 641, 646 (1997) (quoting *Heck*, 512 U.S. at 486-87); s*ee also Portley-El v. Brill,* 288 F.3d 1063, 1067 (8th Cir. 2002) ("The rule in *Heck* covers any § 1983 claim that would 'necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement'" (quoting *Heck*, 512 U.S. at 486)).  The complaint appears to allege that each of Hoover's false, retaliatory reports were ultimately used in support of her stalking charges, which resulted in Favors' parole revocation.  The findings of the Hearings and Release Unit, attached as Exhibit 71[11] confirm this.  If Favors proves that the reports were false and retaliatory, it would impugn his parole revocation for stalking.  Therefore, Favors' 42 U.S.C. § 1983 claims against Hoover should be dismissed without prejudice.[12]

---

[11] Hoover testified that the "series of events" leading to the stalking charge started when Favors asked her about a job in the education unit.  (Ex. 71 [Docket No. 106-3], at 148).  This is the subject of Favors' alleged "Retaliatory First False Report."  (Compl. ¶ 103).

[12] Favors may still seek other avenues to satisfy the *Heck* final-termination rule. *See, e.g.*, *Wilson v. Lawrence County*, 154 F.3d 757, 760-61 (8th Cir. 1998) (executive pardon for innocence satisfies *Heck* rule).

### 3.  Applicability of *Heck* Doctrine to Other Defendants

"[A] state prisoner's 42 U.S.C. § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration."  *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) (emphasis in original).  The State Defendants, Defendant Benson, and County of Dakota (Mehl and Boreland) have not raised the issue of whether *Heck* bars any of Favors' claims against them.  However, because Favors applied to proceed without payment of fees under 28 U.S.C. § 1915, the case is subject to dismissal "*at any time* if the court determines that [. . .] the action or appeal [. . .] fails to state a claim on which relief may be granted."  28 U.S.C § 1915(e)(2)(B)(ii) (emphasis added); *see also Gautreaux v. Sanders*, 395 Fed. Appx. 311, 312 (8th Cir. 2010) (per curiam) (affirming dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B), modified for dismissal without prejudice, of *Heck*-barred § 1983 claim).

With few exceptions, Favors' § 1983 claims against Benson, the State Defendants, and County of Dakota Defendants Mehl and Boreland, if successful, would demonstrate the invalidity of Favors' parole revocation and subsequent imprisonment.  Generally, Favors alleges that the defendants are liable to him because they either aided or failed to prevent Hoover from bringing a false and retaliatory stalking charge against him.  (*See e.g.* Compl. ¶¶ 175, 218, 220, 233, 247, 253-66, 288-90, 299-301, 308, 310).  As of October 15, 2010, when Hoover was terminated from employment at MSOP, Favors asserts State Defendants Schmidt, Swanson, Hebert, Storkamp,

Magaard, James and Virden "et al" knew or should have known he was wrongfully imprisoned but did nothing to release him.  (Compl. ¶¶ 274, 286-87).

These allegations, if true, would obviously mean that Hoover's stalking claims were false and Favors' imprisonment was unlawful.  As discussed above, habeas relief for imprisonment at Stillwater is no longer available because Favors' sentence has expired.  Until Favors otherwise satisfies the *Heck* rule, his 42 U.S.C. § 1983 claims against Benson and the State Defendants, alleging they relied on Hoover's false allegations of stalking as a pretext to violate his constitutional rights, should be dismissed without prejudice.  If successful, all of Favors' constitutional claims against Mehl and Borland, who were involved in the parole revocation hearing, would imply the invalidity of Favors' imprisonment.  Therefore, 42 U.S.C. § 1983 claims against Mehl and Boreland should also be dismissed without prejudice as *Heck*-barred.

Certain of Favors' § 1983 claims against the State Defendants and Benson are not *Heck*-barred because they do not imply the invalidity of Favors' parole revocation and imprisonment.  Those claims will be reviewed as part of the further analysis below to determine whether the allegations state a claim for a 42 U.S.C. § 1983 constitutional violation.  The allegations that do not implicate the *Heck*-bar are as follows: (1) perpetuation of "counter-therapeutic and dangerous environments" where defendants took no action to remove an employee from contact with MSOP patients "despite complaints and overwhelming circumstantial evidence" that the employee was having an inappropriate relationship with a patient, (Compl. ¶ 101); (2) depriving Favors of sex offender treatment and placing him in isolation at MSOP beginning June 10, 2010, (Compl. ¶¶ 233, 241); (3) holding Favors back in treatment, thereby prolonging his

institutionalization, "to continue retaliation against him for filing this Complaint," (Compl. ¶¶ 326, 376); (4) "using Defendant Hoover's reports and allegations . . . as a pretext to exact their own retaliation . . . for filing complaints against these Defendants . . . for problems with these Defendants unrelated to Defendant Hoover), (*see, e.g.*, Compl. ¶ 104, 114); (5) deprivation of a vocational work program based on discrimination and retaliation unrelated to Hoover, (Compl. ¶¶ 439-43); (6) restrictions from use of recreation and education areas in MSOP violated his substantive due process rights, (Compl. ¶¶ 199-20, 447); (7) placement in HSA isolation and the Behavioral Therapy Unit (the "BTU") at MSOP without procedural due process, (Compl. ¶¶ 234, 248, 250, 376); (8) confiscation of legal materials in denial of access to courts, (Compl. ¶¶ 376); (9) deprivations of liberty interests related to conditions in HSA isolation, (Compl. ¶ 240, 363); and (10) deprivations of Fourth and Fourteenth Amendment rights based on searches and restraints used for security in transfers between units and between facilities, (Compl. ¶¶ 239-40, 246, 248-51, 294, 325, 330, 376).

## C.     Personal Involvement in Remaining Section 1983 Claims

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* Plaintiffs must plead facts sufficient to support a defendant's personal involvement in the alleged unconstitutional act. *See Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001) (allegations that defendants instituted

policies that deprived plaintiff of property were insufficient where complaint did not identify the policies).

A prison official may be liable under § 1983 for failure to train. *Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007). A government official is liable if the plaintiff shows "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [the government official] can reasonably be said to have been deliberately indifferent to the need." *Id.* at 1079-80 (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting, in turn, *City of Canton v. Harris*, 489 U.S. 378, 390 (1989))).

"A failure to supervise claim may be maintained only if the official 'demonstrated deliberate indifference or tacit authorization of the offensive acts.'" *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (quoting *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998) (citation and quotations omitted)). The subjective deliberate indifference standard requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). If the risk was obvious, a fact finder may conclude that the prison official knew of the substantial risk. *Id.* at 552.

### 1.    Failure to train

The Court construes as 42 U.S.C. § 1983 claims Favors' broad assertions that the following defendants[13] had a duty to train employees who violated his constitutional

---

[13] Favors alleges defendants held the following positions during the relevant time period: Lori Swanson, Attorney General; Lucinda Jesson, Commissioner of DHS; Dan Storkamp, Deputy Commissioner of DHS; Dennis Benson, Executive Director of MSOP; Ann Linkert (Zimmerman), Security Director at MSOP; Jean Seykora, Rehab Director at MSOP; Mandy Torgerson,

rights:  Lori Swanson, Lucinda Jesson, Dan Storkamp, Dennis Benson, Ann Linkert (Zimmerman), Jean Seykora, Mandy Torgerson, Rob Rose, Ralph Schmidt, Chad Mesojedec, Todd White, Bill Gullickson, the Office of Health Facility Complaints, the Office for Maltreatment Complaints, and Office of Licensing for the Minnesota Security Hospital.  (Compl. ¶¶ 23, 25-27, 38-41, 43, 47-49, 75-77).

To the extent that Favors alleges these defendants failed to train Hoover, resulting in a constitutional injury to him, the claims must fail.  There is no patently obvious need to train a security counselor in a civilly committed sex offender program not to engage in sexual relationships with a patient and then lie to cover it up.  *See Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) ("[i]n light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women.")  Even assuming the training was somehow deficient, the causation element is lacking.  To succeed in a § 1983 claim, "'the identified deficiency in . . . training . . . must be closely related to the ultimate injury' such that 'the deficiency in training actually caused the' . . . offending conduct."  *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) (quoting *City of Canton*, 489 U.S. at 391).  It is not plausible that lack of training caused Hoover to engage in a sexual relationship with a patient.  If lack of training made her believe the relationship was appropriate, there was no reason for her to lie to cover it up or retaliate against Favors for reporting it.  The Court cannot identify any other failure to train claim in the Complaint that is alleged with enough specificity to survive a motion to dismiss.

Grievance Coordinator at MSOP; Rob Rose, Unit 1c Director/Group Supervisor at MSOP; Ralph Schmidt, Director of Office of Special Investigations for MSOP; Chad Mesojedec, Vocational Jobs Supervisor at MSOP; Todd White, Vocational Jobs Supervisor at MSOP; and Bill Gullickson, Officer of the Day at MSOP.  (Compl.  ¶¶ 23, 25, 26, 27, 38, 39, 40, 41, 43, 47, 48, 49).

Therefore, the 42 U.S.C. § 1983 failure to train claims against Lori Swanson, Lucinda Jesson, Dan Storkamp, Dennis Benson, Ann Linkert (Zimmerman), Jean Seykora, Mandy Torgerson, Rob Rose, Ralph Schmidt, Chad Mesojedec, Todd White, Bill Gullickson, the Office of Health Facility Complaints, the Office for Maltreatment Complaints, and the Office of Licensing for the Minnesota Security Hospital for should be dismissed.

### 2. Failure to Supervise

Favors alleges supervisory liability of the State Defendants, Benson, Mehl, and Boreland.[14]  Favors' supervisory allegations against Mehl and Boreland seek to hold them liable for the outcome of the parole revocation hearing, (Compl. ¶¶ 57-58, 220); therefore, those claims are also *Heck*-barred.  The other supervisory claims related to Hoover's inappropriate relationship with a patient fail because none of the defendants were aware of a substantial risk of serious harm to Favors.  Knowledge of a sexual relationship between a staff member and another patient did not pose a serious threat to Favors' health or safety, nor did it pose a serious threat to the success of his sex offender treatment.  *See generally Bailey v. Gardebring*, 940 F.3d 1150, 1155 (8th Cir. 1991) ("A condition for which there is no known or generally recognized method of treatment cannot serve as a predicate for the conclusion that failure to provide treatment constitutes 'deliberate indifference to the serious medical needs of prisoners.'").[15]

---

[14] Favors alleges that Mehl and Boreland were his parole agents, employed by the Minnesota Department of Corrections.  (Compl. ¶¶ 57, 58).

[15] Assuming that Favors' supervisory claims are intended to apply to his claim regarding conditions of confinement, those claims will be addressed below.

### 3. Direct Personal Involvement in Retaliation

Favors seeks to hold the State Defendants liable for retaliation in violation of his First Amendment right to file complaints. However, Favors has failed to allege direct personal involvement in retaliation by the following defendants: Jesson, Lundquist, Kneisel, Gebhart, Anderson, Youngs, Berg, O'Conner, Schleret, Swanson, Kozisch, Linkert (Zimmerman), Swanson, Gullickson, Hibbard, Ranem, Hebert, Storkamp, Virden, Jones and Mesojedec. Favors vaguely alleges that these defendants knew or should have known of Hoover's retaliation but failed to prevent it. (Compl. ¶ 331). These claims should be dismissed as conclusory allegations.

Favors alleges that he has been wrongfully held back in treatment, prolonging his institutionalization, in continued retaliation for filing this complaint.[16] (Compl. ¶ 326). He does not specifically allege any defendant's personal involvement in holding back his treatment after he filed this complaint or any facts to support a retaliatory motive. This claim should be dismissed.

In Paragraph 439 of the complaint, Favors alleges that Todd White deprived him of his rights in a vocational work program based on incompetence, partiality, discrimination and retaliation. White reduced Favors' work hours from 3.5 hours per week to 0.75 hours per week, and then terminated his employment in April 2010. (*Id.* at ¶¶ 439-40). White's alleged motive for retaliation was that Favors filed complaints against White. (*Id.* ¶ 439). Favors alleged personal involvement by White, but Favors also alleges Chad Mesojedic and Deborah James (and others who are not parties to the present motions to dismiss) conspired with White because they knew about Favors'

---

[16] Favors filed the present civil rights complaint on February 21, 2013, but allegations in the complaint suggest some defendants were aware Favors was drafting the complaint as early as June 2010. (Compl. ¶¶ 235-37).

complaints against White but they refused to take steps to prevent White's retaliation. (*Id.* ¶ 440).  Favors' retaliation claims against Mesojedic and James are conclusory and fail to allege sufficient facts to establish a retaliatory motive and causal connection to White's reduction of his work hours and ultimate termination of his employment.  The claims against Mesojedic and James should be dismissed.

### 4.   Direct Personal Involvement in a Fourth Amendment Violation

Favors alleges "daily harassing intimidating and retaliatory" room searches while he was housed in HSA isolation.  (Compl. ¶ 240).  Favors has not alleged who performed or directed the room searches or how the searches were intimidating, harassing or retaliatory.  Therefore, he has not alleged a 42 U.S.C. § 1983 claim for unreasonable search in violation of his Fourth Amendment rights, and the claim should be dismissed.[17]

Favors alleges that he was subjected to strip searches that violated his constitutional rights.  (Compl. ¶¶ 239, 240).  He does not allege any direct personal involvement in performing the strip search, or name any supervisor who was aware of or authorized the strip searches.  *See Beaulieu v. Ludeman*, 690 F.3d 1017, 1030 (8th Cir. 2012) (complaint did not allege who failed to supervise defendants who performed strip search).  He has not identified a policy pursuant to which the strip searches were performed to assert a facial or as applied constitutional challenge against the policy. *See Id.* at 1027 (challenging unclothed visual body search in secured facilities based on reasonable suspicion).  For these reasons, the claims should be dismissed.

---

[17] To the extent the daily room searches in HSA isolation are part of Favors' Fourteenth Amendment substantive due process claim regarding the conditions of confinement, that claim will be addressed below.

### 5.   Direct Personal Involvement in a Fourteenth Amendment Substantive Due Process Violation

Favors alleges that he was subject to a long list of "cruel and unusual abuses" relating to conditions of confinement in HSA isolation, and restraints used when transferring him within MSOP and outside the facility.  (Compl. ¶¶ 239, 240).  The primary claim appears to be that Favors was subjected to isolation based on stalking charges that were untrue and retaliatory, but those claims are *Heck*-barred.  Construing the complaint liberally, Favors also seems to be asserting the conditions in HSA isolation, whether or not he was appropriately confined there, violated his substantive due process rights.  Favors named Hibbard and Ranem as the individuals who each locked him in a room for twenty-four hours.  (Compl. ¶ 240).  Whether Hibbard and Ranem violated Favors' substantive due process rights will be discussed below.

Favors alleges that certain defendants are responsible to supervise all activities in MSOP, and that he filed grievances while in HSA isolation.  Favors did not allege who he complained to about the conditions, or that any particular defendant was aware of the totality of conditions to which he was subjected, or how those conditions posed a risk to his health or safety.  The Court has reviewed the grievances Favors filed while in HSA isolation, attached as exhibits to the complaint, and finds that Favors has not sufficiently alleged that any of the defendants who are parties to the present motions to dismiss were made aware of Favors' grievances about the conditions in isolation affecting his physical or mental health.  *See Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993) (overall supervisor of inmate construction project was not liable where inmate never complained to supervisor about knee condition, and there was no evidence supervisor knew of extent of inmate's preexisting injury).  Furthermore, Favors has not

identified a particular policy that created the conditions, for instance, a policy of no personal property in isolation, no indoor or outdoor recreation, no form of sex offender treatment, half-hour room checks, etc.

Regarding the use of restraints when transported outside the MSOP facility, although Favors has not alleged direct personal involvement of any defendant, the Eighth Circuit recently held that MSOP's policy of using full restraints in transporting patients outside the facility, without performing an individualized risk assessment, did not violate the Constitution. *Beaulieu*, 690 F.3d at 1032-33.[18]

Additionally, Favors did not identify any defendants who "chained, handcuffed and shackled [him], every time he went anywhere within the secured facility and then strip searched on return to HSA," nor did he identify a policy under which these precautions were required. (Compl. ¶ 240). The U.S. Supreme Court held that conclusory allegations that defendants "knew of, condoned, and willfully and maliciously agreed to subject" a plaintiff to harsh conditions of confinement as a matter of policy, while alleging one defendant was "the architect" of the policy and another defendant was instrumental in implementing the policy, failed to allege sufficient facts to state a constitutional claim. *Iqbal*, 556 U.S. at 680-81. Favors' allegations concerning conditions of confinement are much like those in *Iqbal,* and they likewise are deficient in factual support to state a claim of direct personal involvement in a constitutional violation regarding conditions of confinement.

### D. Failure to State a First Amendment Retaliation Claim

Retaliatory actions taken against a prisoner for filing prison grievances are

---

[18] If Favors had identified direct personal involvement of any of the defendants, they would likely be entitled to qualified immunity.

actionable because an inmate has a First Amendment right to file prison grievances. *Spencer v. Jackson County*, 738 F.3d 907, 912 (8th Cir. 2013). Courts have applied the same standard to state detainees who allege retaliatory discipline. *See, e.g.*, *Banks v. Ludeman*, No. 08-cv-5792 (MJD/JJK), 2010 WL 4822892, at *9 (D. Minn. Oct. 4, 2010); *Revels v. Vincenz*, 382 F.3d 870 (8th Cir. 2004) (applying standard to involuntarily committed psychiatric patient at an intermediate security facility). To establish a prima facie case of retaliatory discipline, the Plaintiff must show that "(1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline." *Haynes v. Stephenson,* 588 F.3d 1152, 1155 (8th Cir. 2009) (*quoting Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007)).

The discipline need not be formal, but must be an adverse action that would "chill a person of ordinary firmness from continuing in the activity." *Haggins v. MN DOC Comm'r*, No. 10-cv-4427 (DWF/LIB), 2012 WL 983593, at *8 (D. Minn. Jan. 20, 2012) (quoting *Revels,* 382 F.3d at 876). To establish that exercising the protected right motivated the discipline, "an inmate must show that <u>but for</u> a retaliatory motive the prison official would not have filed the disciplinary report." *Haynes v. Stephenson*, 588 F.3d at 1156 (citing *Goff v. Burton,* 7 F.3d 734, 737 (8th Cir.1993)) (emphasis added); *see also Beaulieu*, 690 F.3d at 1026-27 (even if retaliation was one factor in the decision to transfer an inmate to "BTU," the inmate did not establish the transfer would not have occurred "but for" the retaliation, where supplemental incident reports showed the inmate displayed disruptive behavior).

### 1. Benson

Benson contends that Favors' retaliation claim against him fails because the alleged retaliatory conduct was the result of an actual rule violation by Favors. (Benson's Mem. at 6-7). Benson cites to the QRR, attached as an exhibit to Favors' Complaint,[19] stating Favors "violated three rules this quarter" including a violation for using off-unit areas to follow and watch Hoover. (*Id.* at 6-7 (citing Compl. ¶ 216)).[20] Citing his letter to the HRB, Benson also contends his conduct was motivated by Favors' harassment of staff. (*Id.* at 7). Favors responded that his Complaint does not allege "retaliation" against Benson. (Pl's Reply to State Def. Dennis Benson's Mot. to Dismiss [Docket No. 164], at 4, ¶ 11). However, Favors also said that Benson "wrote an unconstitutional letter threatening discharge from treatment and reprisal to Plaintiff, if Plaintiff filed any more complaints against Defendant Michelle Hoover. Defendant Dennis Benson's letter violated Plaintiff's First Amendment rights to file complaints." (*Id.* at 7, ¶ 17). Favors argues that Benson violated his First Amendment rights by calling his complaints against Hoover "lies." (*Id.* at 8, ¶ 20). He states:

> Plaintiff alleges that Defendant Dennis Benson knew or should have known it was a violation of the First Amendment and Plaintiff's constitutional rights to call his complaints "false allegations" and threaten punishment if Plaintiff pursued his complaints . . . .

(*Id.* at 9, ¶ 23). Favors also alleges that Benson threatened "Behavior Expectation Violations" if Favors continued to report false allegations and harass staff. (Compl. ¶ 207 and Ex. 38).

---

[19] *See* Ex. 40 [Docket No. 106-3].

[20] The Court notes that Favors' behavior of using off-unit areas to follow and watch Hoover was not one of the three rule violations cited in the QRR, it was an evaluation of his "productive and responsible use of his time."

"[N]ot every adverse circumstance encountered by a prisoner will support an actionable retaliation claim." *Jones v. Harcey*, No. 11-cv-616 (MJD/AJB), 2012 WL 2884920, at *5 (D. Minn. Feb. 9, 2012). The inmate must prove that the defendant took adverse action against him that would chill a person of ordinary firmness from engaging in that activity. *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007). A threat of retaliation alone is sufficient, however, if made in retaliation for a prisoner's use of the grievance system. *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994). Therefore, Favors has pled an adverse action by Benson.

However, Favors' allegations against Benson do not establish the third element of a retaliation claim, that "but for" a retaliatory motive to punish Favors for making false allegations against Hoover, Benson would not have threatened Favors with a behavioral expectation violation. Benson was motivated not only by Favors' complaints against Hoover, but also by his other, independent means by which he engaged in harassment of staff. Benson's letter establishes his motive to prevent continued harassment of staff, because he noted that Favors was using off-unit areas to follow and watch Hoover. (*See* Ex. 38). While Favors was entitled to report misconduct by Hoover, the First Amendment does not protect his self-directed investigation of her or other staff. Therefore, Favors failed to sufficiently plead the third "but for" causation element of a First Amendment retaliation claim against Benson.

Favors also alleges claims against Benson premised on Benson's responsibility for the actions of others who were directly involved in the placement of Favors in isolation on June 10, 2010, while Hoover's stalking allegations against him were investigated, and for his subsequent parole revocation on the same charges. (Compl.

¶¶ 229-36, 239-40, 243-70). Even if such claims could be construed in a manner that would not invoke the *Heck* bar, there is no respondeat superior liability for a 42 U.S.C. § 1983 claim. *Campbell v. Clinton*, 2009 WL 5030787, at *5, (E.D. Mo. Dec. 14, 2009) (citing *Hughes v. Stottlemyre*, 454 F.3d 791, 798 (8th Cir. 2006)). Therefore, all First Amendment retaliation claims against Benson should be dismissed.

### 2. Defendants James, Julie Rose, Virden, Magaard, Rob Rose, Hebert, Storkamp, Schmidt, Seykora, Steinert, Torgerson

Prior to his parole revocation, Favors alleges that Defendant Deborah James was involved in writing a retaliatory I.P.P. against him, although her name did not appear in the document, and she did so because he had filed complaints against her. (Compl. ¶¶ 191, 197-98, 202, 204 and Ex. 36). The I.P.P. restricted him from using the recreation and education areas when Hoover was present, from noon to 9:00 p.m. (Compl. ¶ 198 and Ex. 35). Favors also appears to allege that the I.P.P. was retaliatory based on complaints he filed against Julie Rose, although he does not allege how Julie Rose was involved in writing the I.P.P. (Compl. ¶ 198).

Favors alleges Defendants Magaard, Virden and James, along with other defendants who are not parties to the motions to dismiss at issue, "began using Hoover's reports and allegations against him as a pretext to exact their own retaliation" because Favors had complained that these defendants had not investigated his complaints against Hoover, and because he filed complaints against these defendants unrelated to Hoover. (*See, e.g.*, Compl. ¶¶ 104, 151). He also alleged that Virden retaliated against him on behalf of Jamie Jungers, against whom Favors had filed complaints. (Compl. ¶¶ 243-48). Virden's alleged retaliatory action was in response to Favors' request for a continuance for his parole revocation hearing on August 3, 2010.

(*Id.*)  Virden said Favors posed a security risk that would need to be addressed if his parole revocation hearing was continued.  (*Id.*)  As a result, he spent the night in isolation in the HSA, and then was transferred to a segregated housing unit ("SHU") in the Lino Lakes prison until the hearing on August 23, 2010.  (*Id.*)

Next, Favors alleged that Magaard, Virden and James retaliated against him by withholding exculpatory evidence at the parole revocation hearing, with the intention of falsely imprisoning him.  (Compl. ¶ 257).  He alleges that Magaard retaliated against him by falsely testifying that she had told him four times to stop filing complaints against Hoover.  (Compl. ¶¶ 210-14).  He asserts that they retaliated against him by using Hoover's May 2010 report to instigate a criminal complaint against him for stalking.  (Compl. ¶ 188).  Favors also alleged that Rob Rose "took adverse actions" against him "under the pretext" that he was stalking Hoover.  (Compl.  ¶ 160).  Favors did not state why Rose retaliated against him.  (*Id.*)  Favors' allegations that these defendants retaliated against him for filing complaints are based solely on the claim that the adverse actions against him occurred after he complained about these defendants.

In summary of his retaliation claims, Favors alleges that Magaard, Virden, James, Rob Rose, Steinert, Torgerson, Seykora, Hebert, Schmidt, Benson and Storkamp each took adverse actions against him or failed to prevent adverse actions against him by Hoover.  (Compl. ¶ 331).  He alleges these defendants are liable under 42 U.S.C. § 1983 because they knew or should have known about Hoover's retaliation against him.  (*Id.*)

Reading the complaint as a whole, Favors seeks to hold everyone liable who was aware or should have been aware that he complained Hoover's reports against him

were false, and that Hoover was trying to punish him because he had reported her for having an inappropriate sexual relationship with a patient. As discussed above, there is no respondeat superior liability for failing to prevent Hoover from retaliating. Furthermore, Favors' theory that each of these defendants used Hoover's reports as a "pretext to retaliate" for their own reasons, is simply not plausible. It completely ignores the explanation that the defendants acted on Hoover's reports and responded to them because they believed Hoover. *See Braden v. Walmart*, 588 F.3d 585 (where there is a concrete "obvious alternative explanation" for the defendants' conduct, the plaintiff may be required to plead additional facts tending to rule out the alternative) (quoting *Twombly*, 550 U.S. at 567).

Therefore, Favors has not alleged sufficient facts to show that "but for" defendants' personal retaliatory motives they did not believe and rely upon or "use[] Hoover's reports" to take security measures and other actions against Favors for stalking. For these reasons, Favors' First Amendment retaliation claims against James, Julie Rose, Virden, Magaard, Rob Rose, Hebert, Storkamp, Schmidt, Seykora, Steinert and Torgerson, should be dismissed.

### 3. Todd White

Finally, Favors alleges that Todd White retaliated against him by reducing his work hours, and then terminating his employment in the vocational program, and that White did so because Favors filed complaints against him. Assuming this conduct constitutes an adverse action for a First Amendment retaliation claim, the allegations lack sufficient facts for the Court to conclude White would not have reduced Favors' work hours down to zero "but for" a complaint Favors filed against White. In fact, the

exhibits attached to the complaint suggest otherwise, negating the "but for" causation element of retaliation.   (*See* Ex. 41 [Docket No. 106-3], at 51-52 ("Todd White immediately imposed a 90 day disciplinary work restriction on me, for not accepting the kitchen job, the very first day I did not show up"); Ex. 68 [Docket No. 106-3], at 132-37 ("I am applying for unit cleaning and any other job, except dining room, kitchen, or outside jobs"); Ex. 69 [Docket No. 106-3], at 138 ("If you want to refuse this placement [kitchen worker] that is your choice.  However, there are no other job placements for you. . .").  Therefore, this retaliation claim should also be dismissed.

### E.   Conspiracy Claims Under 42 U.S.C. § 1985.

Title 42 U.S.C. Section 1985(3)[21] provides in relevant part:

> (3) Depriving persons of right or privileges
>
> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivations, against any one or more of the conspirators.

"To state a claim under the equal protection provisions of the first part of 42 U.S.C. § 1985(3), [the plaintiff] must allege:  (1) a conspiracy; (2) for the purpose of depriving another of the "equal protection of the laws, or of equal privileges and immunities under the laws;" (3) an act in furtherance of conspiracy; and (4) an injury to a person or property, or the deprivation of a legal right."  *Federer v. Gephardt*, 363 F.3d

---

[21] There are three subparts to 42 U.S.C. § 1985.  The Court assumes that Favors' allegations arise under subpart 3, because his allegations do not involve preventing an officer from performing duties, 42 U.S.C. § 1985(1), or obstructing justice by intimidating a party, witness or juror, 42 U.S.C. § 1985(2).

754, 757-58 (8th Cir. 2004) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971) and 42 U.S.C. § 1985(3)). To succeed on such a claim, there must be proof of class-based animus. *Id.* at 758 (citing *Griffin*, 403 U.S. at 102) ("The language requiring intent to deprive of equal protection, or equal privileges or immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action).

Favors alleges a meeting of the minds by numerous defendants evidenced by "a systematic scheme of back-to-back retaliatory abuses." (Compl. ¶¶ 366-67). He alleges that defendants, including Hoover, "conspired in violation of 42 U.S.C. [§] 1985, to violate [his] rights." (Compl. ¶ 368). Even if the Complaint somehow alleged a meeting of the minds, it does not allege the necessary element under § 1985(3) of a conspiracy predicated on class-based animus. "Purposeful discrimination must be established for a party to succeed on a § 1985(3) claim." *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 570 (8th Cir. 2000) (quoting *McIntosh v. Arkansas Republican Party-Frank White Election Comm.*, 766 F.2d 337 (8th Cir. 1985)). The purpose of the alleged conspiracy here was retaliation for filing complaints, not any class-based or otherwise invidiously discriminatory animus. Therefore, Hoover's claims under 42 U.S.C. § 1985 against the State Defendants, Benson, Mehl and Boreland, and Hoover should be dismissed.

## F.    Denial of Access to the Courts

Favors alleges that Defendants Magaard and Virden, with the assistance of Security Counselor Linda Anderson (not a State Defendant), searched his room in Unit 1C and confiscated his legal materials. (Compl. ¶ 235). Favors concludes that their

intent was to impede his legal process based on retaliation, thus no injury is required to succeed on his denial of access to the courts claim. (Compl. ¶ 237). The State Defendants assert actual injury is an element of the First Amendment right to petition the Government for redress of grievances, and that Favors has not alleged actual injury here. (State Defs.' Mem. at 19-20). The State Defendants are correct. A claim for violation of the constitutional right of access to the courts requires an actual injury, *Lewis v. Casey*, 518 U.S. 343, 351-52 (1996), and Favors has not pled such an injury. (*See* Ex. 41 [Docket No. 106-3] at 60 (showing Magaard returned computer disk containing civil rights complaint)). Mere disturbance in the pursuit of litigation without prejudice to litigation interests does not suffice to allege actual injury. *Monskey v. Moraghan*, 127 F.3d 243, 247 (2nd Cir. 1997). The denial of access to the courts claim should be dismissed.

### G.    Fourteenth Amendment Procedural Due Process Claim

The Fourteenth Amendment Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. There are two steps for reviewing a Fourteenth Amendment procedural due process claim. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). The first step is to determine whether the plaintiff has been deprived of a protected liberty or property interest. *Id.* Protected liberty interests are found in the Due Process Clause itself, and they may also be created by the laws of the states. *Id.* If the plaintiff has a protected liberty or property interest, then the second step is to determine "what process is due by balancing the specific interest that was affected, . . . the likelihood that the [applicable procedures] would result in an erroneous deprivation, . . .

and the [affected program's] interest in providing the process that it did, including the administrative costs and burdens of providing additional process." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 332-35 (1976).

Favors alleges that Bill Gullickson and others physically moved him to HSA isolation on June 10, 2010, upon Jungers' direction, because there was a criminal investigation against him for stalking Hoover. (Compl. ¶¶ 232-33). He alleges that this violated his right to procedural due process because "[n]o rule violation report existed that alleges Mr. Favors ever 'stalked' Defendant Michelle Hoover." (Compl. ¶ 234). He further alleges that he "was unconstitutionally subjected to this extreme psychological and physical abuses ------ with no rule violation or disciplinary due process thereon to justify any of these disciplinary conditions." (Compl. ¶ 240 (punctuation in original)). Favors filed a complaint about this to the HRB on June 18, 2010. (Compl. ¶ 238, Exhibit 43).

The State Defendants did not specifically address Favors' claim that he was denied procedural due process when he was placed in isolation for stalking Hoover without being subject to a rule violation for this behavior. Instead, they focused on Favors' loss of employment at MSOP and loss of his personal electronics. (State Defs.' Mem. at 22-25). Review of the complaint reveals that Favors did not allege that his loss of personal electronics deprived him of a protected property interest under the Due Process Clause. (Compl. ¶¶ 434-36). Favors alleges that these losses occurred as a result of his wrongful imprisonment caused by retaliation, and he seeks damages based on his retaliation claims. (*Id.*) Similarly, his request for relief based on loss of

employment in the vocational program at MSOP is based on his retaliation claims. (Compl. ¶¶ 439-43).

Favors, however, alleges a procedural due process violation of a protected liberty interest. He alleges that defendants failed to afford "his rights in accord with established hospital policies and Department of Human Services rules and regulations, and while acting under the color of state law . . . [and] denied . . . his constitutional right to due process of law by arbitrarily depriving him of State created liberty interest and protections." (Compl. ¶ 389). Favors claims he was subjected to disciplinary restrictions without first being subject to a rule violation, citing Minnesota Rule 9515.3090. (Compl. ¶ 400(n)). Favors also alleges a general right to be free from a deprivation of liberty under the Due Process Clause. (Compl. ¶ 387(11)).

Minnesota Rule 9515.3090 does not establish that a person placed in protective isolation must first be subject to a behavioral rule violation. *See* Minn. R. Subp. 4. Under the Minnesota Rules governing the MSOP program, the violation of a rule of behavior may result in a "disciplinary restriction," defined as withholding or limiting privileges. Minn. R. 9515.3090, Subp. 2. "Protective isolation" is different, and is defined as "placing a person in treatment in a room from which the person is not able or permitted to exit as a way of defusing or containing dangerous behavior that is uncontrollable by any other means." Minn. R. Subp. 4. Protective isolation must not be used for "the convenience of staff," *id.*, Subp. 4(A), a phrase that appears in Favors' complaint. (Compl. ¶ 99). Favors' complaint and attached exhibits, however, indicate he was placed in isolation on June 10, 2010, because he was being investigated for stalking Hoover. (Compl. ¶ 233 and Exhibit 41). Favors' allegation that his isolation

was for the convenience of staff is nothing more than a conclusory allegation. Furthermore, Favors has not stated a procedural due process claim, created under the Minnesota Rules, which precludes use of protective isolation without the existence of a rule violation.  *See*, *Senty-Haugen*, 462 F.3d at 887 ("although state statutes and regulations can give rise to constitutionally required procedural protections in certain circumstances, *see Morgan v. Rabun*, 128 F.3d 694, 699 (8th Cir. 1997), they 'cannot dictate what procedural protections must attend a liberty interest—even a state created one.' *Swipies v. Kofka*, 419 F.3d 709, 716 (8th Cir. 2005)").

The Eighth Circuit stated in *Senty-Haugen* that "[t]he most important mechanisms for ensuring that due process has been provided are 'notice of the factual basis' leading to a deprivation and 'a fair opportunity for rebuttal.'"  462 F.3d at 888 (quoting *Wilkinson v. Austin*, 545 U.S. 209, 225-26 (2005)).  The Eighth Circuit explained that, given Senty-Haugen's limited liberty interest as a person indefinitely committed to state custody, the fact that he received notice and a right to be heard regarding isolation, the decision to use isolation was a discretionary subjective decision by state officials, and defendants had a vital interest in maintaining a secure environment, Senty-Haugen failed to show defendants violated his due process rights.  *Id.* at 887.

In the present case, Favors' Complaint and attached exhibits indicate that he was immediately notified by Defendant Gullickson that he was being taken to isolation because he was under investigation for stalking Hoover.  (Compl. ¶ 233).  Favors complained to the HRB.  (Compl. ¶ 238.)  Eight days later, Favors appeared before the HRB to contest his placement in isolation, among other complaints.  (Exhibit 43, Docket

No. 106-3 at 79-80). Then, Favors' parole was revoked for stalking Hoover, after a full hearing. (Compl. ¶¶ 253-54).

Even if Favors was entitled to greater procedural protections (which the Court does not find to be the case) than the notice and opportunity to be heard that he was in fact provided when placed in isolation, he has not cited any precedent that he was clearly entitled to additional procedural safeguards, nor is the Court aware of any such precedent. Therefore, the state defendants are entitled to qualified immunity on the Fourteenth Amendment procedural due process claim regarding Favors' isolation at MSOP beginning June 10, 2010. *Senty-Haugen*, 462 F.3d at 888 (finding qualified immunity from claims for money damages regarding the adequacy of procedures used for isolation based on security reasons). Favors' claims for equitable remedies are moot because he is no longer subject to protective isolation for stalking Hoover; he has already served the remainder of his sentence after his parole was revoked for stalking Hoover; and although Favors has returned to MSOP, Hoover is no longer employed there. *See Id.* at 889 (claims for injunctive and declaratory relief were moot where isolation ended, and there was no reasonable expectation the plaintiff would be subject to isolation again). This claim should be dismissed.

## H. Fourteenth Amendment Substantive Due Process Claims

The Fourteenth Amendment protects against the government engaging in conduct that is so arbitrary and egregious that it "shocks the conscience" or that interferes with rights "implicit in the concept of ordered liberty." *Strutton v. Meade*, 668 F.3d 558 (8th Cir. 2012) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

### 1.    Loss of Wages and Employment in the Vocational Program

Favors alleges that Todd White deprived him of "his statutory rights to receive Vocational Work Programs."  (Compl. ¶ 439).   Favors has not identified any state statutes that create an interest in employment in "Vocational Work Programs" at MSOP. Furthermore, deprivation of participation in a vocational work program while civilly committed for sex offender treatment is not a deprivation that "shocks the conscience." *See Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir. 1992) (prisoners have no constitutional right to participation in vocational programs while incarcerated but, if the State provides such programs it cannot deny equal access absent a rational basis). Therefore, Favors' Fourteenth Amendment substantive due process claim fails.

### 2.    Loss of recreation and education time

Favors alleges that the loss of recreation and education activities from noon until 9:00 p.m. deprived him of Fourteenth Amendment state-created liberty interest in these activities, created by the Patient Health Care Facilities Bill of Rights.  (Compl. ¶¶ 199-200).   Regardless of the fact that Favors alleges "no one from other living units usually attended these activities before 12:00 p.m.," the Court finds that Favors was not deprived of these activities where he could use the areas designated for these activities before noon.   Therefore, he has not alleged a cognizable Fourteenth Amendment substantive due process claim.

### 3.    Seclusion

Civilly committed persons, like pre-trial detainees "are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment." *Beaulieu*, 690 F.3d at 1045 (quoting *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir.

2005) (quotations and citations omitted)).  The same deliberate indifference standard is applied to civilly committed persons' Fourteenth Amendment claims as is applied to conditions-of-confinement claims made by convicts.  *Id.*  Thus, plaintiffs must establish the following to show a constitutional violation: "(1) that [the conditions of their confinement] posed a substantial risk of serious harm (objective component), and (2) the [defendants] actually knew of but disregarded, or were deliberately indifferent to, [the plaintiffs'] health or safety (subjective component)."  *Id.* (quoting *Crow*, 403 F.3d at 602).  Conditions are "cruel and unusual" if they constitute a deprivation of the "minimal civilized measure of life's necessities."  *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994) (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (quoting in turn *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

The only direct personal involvement that Favors alleged regarding conditions in isolation is that Hibbard and Ranem each locked him in a room for a twenty-four hour period.  He has not alleged he was deprived of food, warmth or necessary medical attention during these two twenty-four hour periods.  *See Simpson v. Hvass*, 36 Fed. Appx. (8th Cir. 2002) (inmate "had no right to due process prior to being confined to his cell for a twenty-four hour period"); *Wishon*, 978 F.2d at 449 (prisoner who was permitted only forty-five minutes out-of-cell exercise per week and thirty minutes per week for showers did not show constitutional violation where he did not show any injury or decline in health).  Favors has failed to allege a cognizable Fourteenth Amendment substantive due process violation for being locked in his room for a twenty-four hour period on two occasions.

### 4.      Inadequate treatment

In Paragraph 2 of his Complaint, Favors alleges that defendants have failed to provide him adequate treatment that will give him a realistic opportunity to be released. In Paragraph 376 of the Complaint, under the heading "Conclusion", Favors alleges that he was subject to sexual discrimination, denied appropriate treatment, forced "into an illegally operated treatment program (TruThought); and he was denied the "right to proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary."

Apart from the very limited period of time when Favors was provided no treatment while incarcerated upon revocation of his parole, he does not provide any explanation of how or why his treatment was otherwise inadequate.   Therefore, his claims of inadequate treatment are too conclusory to state a cause of action under the Fourteenth Amendment or under the Minnesota Commitment Act.  These claims should be dismissed.

### 5.      Wrongful discharge from treatment

Favors alleges he was "wrongfully removed . . . from treatment on June 10, 2010 until March 2011, during which time Mr. Favors was put in twenty-four hour total isolation, BTU non-treatment unit, the State penitentiary, all under false pretexts to retaliate and subject Mr. Favors to cruel or unusual abuse, in violation of Mr. Favors rights to treatment, as it applies to Mr. Favors while civilly committed for treatment to these Defendants . . . ."  (Compl. ¶ 102).  In Paragraph 363(a) of the complaint, Favors asserts this conduct prolonged his institutionalization, violated his constitutional and

statutory rights to treatment, and constituted deliberate indifference to his serious medical and treatment needs. (*Id.*)

Favors does not have a fundamental due process right to sex offender treatment while he is in protective isolation at MSOP or while he is confined in prison for a parole revocation. *See Strutton*, 668 F.3d at 557 (civilly committed sex offender does not have a substantive due process right to sex offender treatment). A violation of state law, here the Minnesota Commitment Act, creates a substantive due process claim only where the state action is "truly egregious and extraordinary." *Id.* (citing *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104 (8th Cir. 1992)). It was not arbitrary or egregious to restrict Favors from attending sex offender treatment from June 10, 2010, through August 23, 2010. Favors was accused of stalking a staff member, in violation of his parole, and it was a proper security measure to remove him from the general population while that claim was being investigated. (Compl. ¶ 233). After his parole was revoked and he was returned to prison, Favors did not have a constitutional right to sex offender treatment. *See Bailey v. Gardebring*, 940 F.2d 1150, 1155 (8th Cir. 1991) (the failure of prison administrators to provide "precisely tailored psychiatric treatment" for sexual psychopaths cannot fairly be described as "deliberate indifference.") For these reasons, his inadequate treatment claims should be dismissed.

## I.    Supplemental Jurisdiction Over State Law Claims

Defendant Hoover requests that the Court decline to exercise supplemental jurisdiction over Favors' state law claims. (Hoover's Mem. at 27). Supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) by a federal court over state law claims may be exercised at the discretion of the district court. *Glorvigen v. Cirrus Design Corp.*, 581

F.3d 737, 749 (8th Cir. 2009). Because this Court recommends granting the motions to dismiss all federal claims against the State Defendants, Benson, County of Dakota and Hoover, the Court should decline to exercise supplemental jurisdiction over the state law claims against these defendants. *See Gregoire v. Class*, 236 F.3d 413, 419-20 (8th Cir. 2000) (stating federal courts should exercise judicial restraint and avoid state law issues whenever possible).

IV.     **CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED**:

1.      That Michelle Hoover's motion to dismiss Favors' federal claims against her, [Docket No. 195], be **GRANTED**;

2.      That the State Defendants' motion to dismiss Favors' federal claims against them, [Docket No. 88], be **GRANTED**;

3.      That the County of Dakota's motion to dismiss Favors federal claims against Christopher Boreland and Mark Mehl, [Docket No. 139], be **GRANTED**;

4.      That Dennis Benson's motion to dismiss Favors' federal claims against him, [Docket No. 132], be **GRANTED**;

5.      That Favors' federal claims against Michelle Hoover; the State Defendants; Christopher Boreland and Mark Mehl; and Dennis Benson be **DISMISSED without prejudice**; and

6.     That the Court decline to exercise supplemental jurisdiction over the remaining state law claims against Michelle Hoover, the State Defendants, the County of Dakota (Mehl and Boreland), and Dennis Benson.

Dated this **13**[th] day of **May, 2014**.            s/Leo I. Brisbois
                                                        LEO I. BRISBOIS
                                                        United States Magistrate Judge

## NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **May 27, 2014**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection.  A party may respond to the objections within fourteen days of service thereof.  Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.